# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| AMERIFORGE GROUP INC., *et al.*,[1] | § | Case No. 17-32660 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Pending) |
| | § | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) PERFORM INTERCOMPANY TRANSACTIONS AND (II) GRANTING RELATED RELIEF**

THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED.  IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER.  IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.  A HEARING WILL BE HELD ON THIS MATTER ON <u>MAY 2, 2017, AT 2:30 P.M. (CT)</u> BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

The above-captioned debtors and debtors in possession (together, the "<u>Debtors</u>") respectfully state the following in support of this motion (this "<u>Motion</u>"):

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Ameriforge Group Inc. (7053); 230 Bodwell Corporation (3965); Advanced Joining Technologies, Inc. (6451); AF Gloenco Inc. (9958); AFG Brazil Holdings LLC (8618); AFG Brazil LLC (8720); AFG Louisiana Holdings Inc (4743); Allpoints Oilfield Services LLC (8333); Ameriforge Corporation (1649); Ameriforge Cuming Insulation LLC (0264); Century Corrosion Technologies LLC (8548); Cuming Corporation (9782); Dynafab Acquisitions Corp. (1331); Flotation Technologies LLC (4572); FR AFG Holdings, Inc. (2623); NRG Manufacturing Louisiana LLC (5823); NRG Manufacturing Inc (7544); Steel Industries Inc. (5154); Steel Industries Real Estate Holding LLC (1298); and Taper-Lok Corporation (8833). The debtors' service address is:  945 Bunker Hill Road, Suite 500, Houston, Texas 77024.

## Relief Requested

1.     The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) authorizing, but not directing, the Debtors to (i) continue to operate their cash management system, (ii) honor certain prepetition obligations related thereto, (iii) maintain existing business forms in the ordinary course of business, and (iv) continue to perform intercompany transactions consistent with historical practice, and (b) granting related relief.

## Jurisdiction, Venue, and Background

2.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order"). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 105, 345, 363, and 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1(b) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

4.     On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

2

Bankruptcy Code.   The Debtors have concurrently filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).   A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Curtis S. Samford in Support of Chapter 11 Petitions and First Day Motions* (the "Samford Declaration"), filed contemporaneously herewith and incorporated herein by reference.[2]

## The Cash Management System

### I.     Overview.

5.     To facilitate the efficient operation of their businesses, the Debtors maintain an integrated, centralized cash management system to collect, transfer, and disburse funds generated by their operations (the "Cash Management System").   The Cash Management System is comparable to the centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner.   The Debtors' finance department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.   The Debtors' finance department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

### II.     Bank Accounts.

6.     The Cash Management System is summarized on **Exhibit 1** annexed to **Exhibit A** attached hereto.   The Cash Management System consists of 38 bank accounts,[3] each as described below (collectively, the "Bank Accounts").   The Bank Accounts reside at two different banks or

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Samford Declaration.

[3]     There are approximately 40 other bank accounts maintained in the name of, and for the benefit of, non-debtor, foreign affiliates.   These accounts are operated on a standalone basis by the applicable non-debtor affiliate and are not part of the Debtors' Cash Management System.   Therefore, they are not included herein.

KE 45569493

financial institutions (collectively the "Cash Management Banks").   Thirty-five of the Bank Accounts reside at Deutsche Bank Trust Company Americas ("Deutsche Bank") and three at Cadence Bank.  The Bank Accounts are identified on **Exhibit 2** annexed to **Exhibit A** attached hereto.  As of the Petition Date, the Debtors have approximately $11.7 million cash on hand.

7.     The Debtors' Bank Accounts are described in the following table:

| Accounts | Descriptions of Accounts |
|---|---|
| **Main Operating Account**<br><br>Deutsche Bank<br>****2679 | This account (the "Main Operating Account") is the main operating and concentration account for the Debtors.  The Main Operating Account receives operating revenue through check receipts, automated clearing house ("ACH") payments, and wires.  The Main Operating Account also funds disbursements and the issuance of checks for the Debtors' operating, capital, and general administrative expenses, and also funds the Payroll Account, the Disbursement Accounts, and the Receipt/Disbursement Accounts (each as defined below).  As of the Petition Date, the Main Operating Account held approximately $161,749.48. |
| **Payroll Account**<br><br>Deutsche Bank<br>****2687 | Ameriforge Group Inc. maintains an account to pay payroll expenses to, and on account of, the Company's employees (the "Payroll Account").  This is a zero balance account that automatically transfers funds from the Main Operating Account in an amount sufficient only to cover payroll disbursements immediately prior to their initiation each pay period.  As of the Petition Date, this account held no balance. |
| **Lockbox Account**<br><br>Cadence Bank<br>****4850 | There is one lockbox account maintained at Cadence Bank (the "Lockbox Account") that is used to manage the Debtors' operating cash flow.  The Debtors transfer funds out of this account into the Main Operating Account on a periodic basis to cover the Debtors' accounts-payable disbursements and intercompany loans, as well as on an as-needed basis.  As of the Petition Date, the Lockbox Account held $2,378,947.86. |
| **Deposit Account**<br><br>Cadence Bank<br>******3873 | Ameriforge Group Inc. maintains a high-yield deposit account (the "Deposit Account"), the funds of which are used to manage the Debtors' operating cash flow.  The Debtors transfer funds out of this account into the Main Operating Account on a periodic basis to cover the Debtors' accounts-payable disbursements, as well as on an as-needed basis.  The funds in this account consist of sale proceeds received on December 28, 2016, from the Company's sale of certain subsidiaries.  The Deposit Account is not invested in securities but is instead a deposit account that provides a higher-yield interest rate as determined by Cadence Bank.   As of the Petition Date, this account held approximately $9,132,662.97. |
| **Escrow Account**<br><br>Cadence Bank<br>******7607 | Ameriforge Group Inc. maintains dual control over an escrow account (the "Nautilus Escrow Account") with Nautilus Minerals Niugini Limited ("Nautilus") in connection with an open purchase order.  The Nautilus Escrow Account currently holds no balance, but once Nautilus funds the account the Debtors will ship and transfer ownership of certain goods to Nautilus.  Once Nautilus receives the goods, the escrow agent will transfer the funds to the Main Operating Account and close the Nautilus Escrow Account. |

| Accounts | Descriptions of Accounts |
|---|---|
| **Disbursement Accounts**<br><br>Deutsche Bank<br>****9525<br>****9656<br>****9605<br>****9090<br>****9592<br>****9664<br>****9584<br>****8071<br>****9576<br>****9680<br>****9672<br>****9533<br>****9613<br>****9568<br>****9541<br>****9621<br>****9648 | These accounts (the "<u>Disbursement Accounts</u>") are zero-balance accounts funded, as necessary, by the Main Operating Account immediately before issuing checks for payments to the Debtors' vendors and suppliers. The Debtors receive daily notice of checks that will clear from a Disbursement Account in a given day, which amount is then funded into the applicable Disbursement Account. This allows for daily management of the Debtors' cash position. As of the Petition Date, the Disbursement Accounts held no balance. |
| **Receipt/Disbursement Accounts**<br><br>Deutsche Bank<br>****2791<br>****0006<br>****0126<br>****2740<br>****2804<br>****2732<br>****0062<br>****2724<br>****2820<br>****2812<br>****2695<br>****2767<br>****2716<br>****2708<br>****2775<br>****2783 | These accounts (the "<u>Receipt/Disbursement Accounts</u>") are also zero-balance accounts that are funded, as necessary by the Main Operating Account immediately before disbursing funds via wires or ACH payments to vendors and suppliers. The account also directly receives customer payments, operating revenues, and other cash receipts, which are swept daily into the Main Operating Account. The Debtors receive daily notice of payments that will clear from a Receipt/Disbursement Account in a given day, which amount is then funded into the applicable Disbursement Account. This allows for daily, up-to-date management of the Debtors' cash position. Thus, as of the Petition Date, the Receipt/Disbursement Accounts held no balance. |

8.     The Debtors pay their Cash Management Banks approximately $16,000 per month in the aggregate on account of fees incurred in connection with maintaining the Bank Accounts (the "<u>Bank Fees</u>"). The Bank Fees are generally due and paid in the middle of each month. The Debtors estimate that they owe the Cash Management Banks approximately $20,000 in Bank Fees as of the Petition Date, including $4,000 in fees related to the opening of the Nautilus Escrow Account. The Debtors seek authority to continue paying the Bank Fees,

5

including prepetition Bank Fees, in the ordinary course on a postpetition basis, consistent with historic practices.

## III.   Compliance of the Bank Accounts with Section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines.

9.      Each Bank Account is maintained at a bank that is insured by the Federal Deposit Insurance Corporation (the "FDIC") and, therefore, complies with section 345(b) of the Bankruptcy Code.[4]  Further, the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Operating Guidelines") generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee").

10.      Here, the Debtors maintain three Bank Accounts at Cadence Bank, which is an authorized depository institution in the Southern District of Texas.  The Debtors also maintain 35 accounts at Deutsche Bank, an institution that is not an authorized depository institution in the Southern District of Texas.  The Debtors respectfully request the Court authorize Deutsche Bank to continue to maintain, service, and administer the applicable Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business, notwithstanding that they are not authorized depository institutions; indeed, Deutsche Bank is a well-capitalized financial institution that is among the largest financial institutions in the world.  Additionally, all of the Bank Accounts at these institutions are insured by the FDIC, and as of the date hereof, all the balances in the Deutsche Bank accounts currently do not exceed the

---

[4]     The Debtors submit that the Deposit Account complies with section 345(b).  Although the Deposit Account generates interest at a higher rate of return than a traditional deposit account based on bank-determined rates, it is not invested in securities and the amounts held in such account are fully liquid.  The Debtors will work in good faith with the U.S. Trustee, however, to resolve any concerns raised by his or her office regarding the continued use of this account on a postpetition basis.

KE 45569493

FDIC-insured limit.   Accordingly, the Debtors submit that it is appropriate to continue to maintain depository Bank Accounts at Deutsche Bank.

11.      Requiring the Debtors to close the Bank Accounts at Deutsche Bank and reopen them at a designated authorized depository, particularly in light of the prepackaged nature of these chapter 11 cases and the anticipated timeframe for confirmation of the Plan, as well as due to their integral role in the Debtors' Cash Management System, would place an unnecessary administrative burden on the Debtors given that there is no meaningful risk to the cash held therein.   Therefore, the Debtors respectfully submit that cause exists to continue to allow the Debtors to utilize the existing Bank Accounts given the expedited timetable contemplated by these prepackaged chapter 11 cases.   In the event any of the Bank Accounts at Deutsche Bank cease to be in compliance with section 345(b) of the Bankruptcy Code during these chapter 11 cases, the Debtors request that they have 60 days to bring such accounts back into compliance and the Debtors will work in good faith with the U.S. Trustee to resolve any concerns raised by his or her office regarding the continued use of these accounts on a postpetition basis.

IV.     **Purchase Cards.**

12.      As part of the Cash Management System, the Debtors provide certain employees with purchase and credit cards (collectively, the "Purchase Cards") issued pursuant to a Commercial Card Program Master Agreement with Amegy Bank National Association (the "Purchase Card Program").   As of the Petition Date, approximately 200 employees have been issued Purchase Cards.   The employees use the Purchase Cards for approved, legitimate business expenses and supplies incurred on behalf of the Debtors in the ordinary course of business.   Costs incurred through use of the Purchase Cards are debited from the Main Operating Account on a monthly basis.

KE 45569493

13.     On average, approximately $230,000 per month is debited from the Main Operating Account on account of employees' use of the Purchase Cards.  The Debtors do not pay any service fees in connection with the Purchase Cards.  As of the Petition Date, the Debtors do not owe anything on account of the Purchase Cards.  The Debtors seek authority to continue the Purchase Card Program, subject to any terms and conditions thereof, on a postpetition basis consistent with past practice, or to enter into new, substantially similar Purchase Card arrangements in the ordinary course, and to pay any prepetition amounts related to the Purchase Cards.

**V.      Compliance with U.S. Trustee Guidelines as to Business Forms.**

14.     The Debtors utilize certain, limited preprinted correspondence and business forms, such as letterhead and preprinted checks (collectively, the "Business Forms"), in the ordinary course of their businesses.  The Debtors also maintain books and records to document, among other things, their profits and expenses.  The U.S. Trustee Guidelines require that the Cash Management Banks print "Debtor in Possession" and the bankruptcy case number on checks issued after the Petition Date.

15.     To minimize unnecessary additional expenses to their estates, the Debtors request that the Court authorize their continued use of their Business Forms to the limited extent they are preprinted and in existence before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the unnecessary expense and delay of ordering entirely new forms as required by the U.S. Trustee Operating Guidelines.

**VI.     Intercompany Transactions.**

16.     The Debtors maintain business relationships with each other (the "Intercompany Transactions") resulting in intercompany receivables and payables in the ordinary course of business (the "Intercompany Claims").  Intercompany Transactions are made, through wires,

ACH and checks, either to (a) reimburse certain Debtors for various expenditures associated with their business, (b) fund certain Debtors' accounts in anticipation of such expenditures, as needed, or (c) transfer funds up to the Main Operating Account when such excess revenue is available.

17.     As discussed above, Ameriforge Group Inc. holds the Main Operating Account. The Main Operating Account will receive and disburse funds from daily sweeps of the Payroll Account, the Disbursement Accounts, and the Receipt/Disbursement Accounts maintained at Deutsche Bank, as necessary.  Specifically, the Main Operating Account funds the subsidiary Debtors' operations and payroll requirements as the need arises.  Conversely, when excess revenue is available to the Debtor subsidiaries, those entities transfer funds to Ameriforge Group Inc., which, in turn, uses such funds to fund the Debtors' various operating expenses.

18.     Each of the transfers discussed above is made on an as-needed basis in the Debtors' discretion.  In connection with the daily operation of the Cash Management System, as funds are swept and disbursed throughout the Cash Management System and as business is transacted between the Debtors, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor.  Certain Intercompany Claims are settled in cash while others are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.

19.     Further, Ameriforge Group Inc. occasionally wires cash from the Main Operating Account to its foreign non-Debtor affiliates in its discretion on an as-needed basis to fund operations at those entities, which are accounted for as intercompany loans in the Debtors' books and records (the "Intercompany Loans").  It is estimated that as of April 27, 2017, the Debtors have $170.6 million in net receivables owed by various non-Debtor affiliates.  These Intercompany Loans occur in a variety of circumstances, such as to provide their foreign

9

subsidiaries with funding for general corporate purposes, equipment acquisitions, or to otherwise fund their operations.  The Intercompany Loans comprise either long-term loans evidenced by promissory notes between the respective entities, which are generally repaid between two and 24 months, or short-term advances, which are generally settled within 30 days.  For the avoidance of doubt, such Intercompany Loans are not characterized as Intercompany Transactions in the Debtors' books and records and the Debtors do not seek approval to continue making Intercompany Loans pursuant to this Motion.[5]

20.     The Debtors track all fund transfers through their accounting system and can ascertain, trace, and account for all Intercompany Transactions.   If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.

<u>**Basis for Relief**</u>

**I.     Maintaining the Existing Cash Management System Is Essential to the Debtors' Ongoing Operations and Restructuring Efforts.**

21.     The U.S. Trustee Operating Guidelines require debtors in possession to, among other things:

a.     establish one debtor-in-possession bank account for all estate monies required for the payment of taxes, including payroll taxes;

b.     close all existing bank accounts and open new debtor-in-possession accounts; and

c.     maintain a separate debtor-in-possession account for cash collateral.

22.     These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and to help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before

---

[5]     The Debtors reserve the right to seek such authority by separate motion, as needed.

the Petition Date.  Considering, however, that the Debtors' business and financial affairs are complex and require the collection, disbursement, and movement of funds through the Bank Accounts, much of which is either automated or tightly integrated with the Debtors' operational, accounting, and IT infrastructure, enforcement of these provisions of the U.S. Trustee Operating Guidelines during these chapter 11 cases would severely disrupt the Debtors' operations.  Accordingly, the Debtors respectfully request that the Court allow them to operate the Bank Accounts as they were maintained in the ordinary course of business before the Petition Date.

23.     Continuation of the Cash Management System is permitted by section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter."  *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In addition, in granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in relevant part*, 997 F.2d 1039, 1061 (3d Cir. 1993).  The requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient."  *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (stating that a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

24.     Courts in this district have regularly waived the Guidelines on the grounds that they may be potentially disruptive to a debtor's postpetition business operations and restructuring

efforts. *See, e.g.*, *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Sept. 12, 2016); *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. July 29, 2016); *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. June 30, 2016); *In re Ultra Petrol. Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. June 28, 2016); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016); *In re Southcross Holdings LP*, No 16-20111 (MI) (Bankr. S.D. Tex. Mar. 29, 2016).[6]

## II. Maintaining the Existing Cash Management System Will Not Harm Parties in Interest.

25.     Continued use of the Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative expenses and inefficiencies associated with disrupting this system and minimizing delays in the payment of postpetition obligations.[7]  The Debtors respectfully submit that, because they utilize appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations, maintaining the Cash Management System, including the Bank Accounts, will not harm parties in interest.

26.     Specifically, with the assistance of their advisors, the Debtors have implemented internal control and accounting system procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' finance department.  In light of such protective measures, the Debtors submit that maintaining the Cash Management System in the ordinary course of business is in the best interests of their estates and creditors.

---

[6]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

[7]     Notwithstanding the Debtors' use of a consolidated cash management system, the Debtors intend to calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which entity pays those disbursements.

III.    **Authorizing the Debtors to Continue Using Debit, Wire, Credit Card, and ACH Payments Is Warranted.**

27.     The Debtors request that the Court further waive the U.S. Trustee Operating Guidelines to the extent they require the Debtors to make all disbursements by check. In particular, the U.S. Trustee Operating Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement.  As discussed above, in the ordinary course of business, the Debtors conduct transactions through ACH transfers and other similar methods.  In addition, a certain percentage of the Debtors' receipts are received through wire transfer payments.  If the Debtors' ability to conduct transactions by debit, wire, ACH transfer, or other similar methods is impaired, the Debtors may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted, and their estates will incur additional costs.

IV.     **Authorizing the Cash Management Banks to Continue to Maintain, Service, and Administer the Bank Accounts in the Ordinary Course of Business Is Warranted.**

28.     As discussed above, implementing the U.S. Trustee Operating Guidelines would interrupt the Debtors' operations and impair the Debtors' efforts to preserve the value of their estates and reorganize in an efficient manner.  Thus, the Debtors respectfully request that the Court authorize the Cash Management Banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business.  In this regard, the Cash Management Banks should be authorized to receive, process, honor, and pay any and all checks, ACH transfers, and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto; *provided* that any check, draft, or other notification that the Debtors advise the Cash Management Banks to have been drawn, issued, or otherwise presented before the Petition

13

Date may be honored by the Cash Management Banks only to the extent authorized by order of the Court.

29.     The Debtors further request that the Court authorize the Cash Management Banks to accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date.   The Debtors also request that, to the extent any Cash Management Bank honors a prepetition check or other item drawn on any Bank Account either at the direction of the Debtors or in a good-faith belief that the Court has authorized such prepetition check or item to be honored, such Cash Management Bank will not be deemed liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition.   The Debtors respectfully submit that such relief is reasonable and appropriate because the Cash Management Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

30.     Moreover, the Debtors request that the Court authorize the Cash Management Banks to continue to charge the Debtors the Bank Fees, as applicable, in the ordinary course of business.   The Debtors further request that the Court order that liens on any of the Bank Accounts granted to creditors will not have priority over the Bank Fees of the respective Cash Management Bank at which the Bank Account is located.

31.     Courts in this district have regularly waived the U.S. Trustee Operating Guidelines on the grounds that they may be potentially disruptive to a debtor's postpetition business operations and restructuring efforts.   *See, e.g.*, *In re CJ Holding Co.*, No. 16-33590 (DRJ)  (Bankr. S.D. Tex. Sept. 12, 2016);   *In  re Linn  Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. July  29, 2016);   *In  re  SandRidge  Energy,  Inc.*, No.  16-32488  (DRJ)

(Bankr. S.D. Tex. June 30, 2016); *In re Ultra Petrol. Corp.*, No. 16-32202 (MI)

(Bankr. S.D. Tex. June 28, 2016); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ)

(Bankr. S.D. Tex. May 2, 2016).

**V.  The Court Should Authorize the Debtors to Continue the Purchase Card Program and Pay any Prepetition Amounts Related Thereto.**

32.  As part of the Cash Management System, the Debtors request authority to continue the Purchase Card Program in the ordinary course of business, as well as pay any prepetition amounts related thereto.  Historically, the Debtors have used the Purchase Card Program to directly fund necessary business expenses from the Main Operating Account.

33.  Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so.  *See Ionosphere Clubs,* 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an an operating business' going-concern value.'"  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ*, *L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Moreover, under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code."  11 U.S.C. § 105(a); *In re CoServ, L.L.C.*, 273 B.R. at 497 (finding that sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor-in-possession to pay pre-petition claims); *In re CEI Roofing, Inc.*, 315 B.R. at 56; *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003).  The above-referenced sections of the Bankruptcy Code therefore authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the

debtor's estate, as is the case here. *See, e.g.*, *In re CoServ*, *L.L.C.*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate.").

34.     Section 363(c)(1) of the Bankruptcy Code also authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." The Debtors engage in the Purchase Card Program on a regular basis, such that payment of the Purchase Cards are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and do not require court approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to continue the Purchase Card Program, and pay any prepetition amounts related thereto, subject to the terms and condition thereof.

35.     The Purchase Card Program allows the Debtors' employees, particularly those who work out in the field, to purchase necessary materials and supplies directly on behalf of the Debtors, and the Debtors in turn are able to pay those amounts directly from the Main Operating Account so that these employees do not bear the burden of carrying those costs until they can obtain reimbursement. The Purchase Card Program provides the Debtors with a streamlined system for funding necessary business expenses and contributes to the overall efficiency of the Debtors' business operations. If the Purchase Card Program were discontinued, the Debtors would no longer be able to directly fund the purchase of necessary business supplies and the operation of the Debtors' businesses would suffer. Therefore, the Debtors request that the Court authorize the Debtors to continue the Purchase Card Program, subject to the terms and conditions thereof, in the ordinary course of business.

## VI.     The Debtors Respectfully Request That the Court Authorize the Debtors to Continue Using Their Existing Business Forms.

36.     The U.S. Trustee Operating Guidelines also require debtors in possession to obtain checks that bear the designation "debtor in possession" on such checks.  To avoid disruption of the Cash Management System and unnecessary expense, the Debtors respectfully request that the Court authorize the Debtors to continue to use their Business Forms, substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession.  The Debtors submit that continuing to use their Business Forms substantially in the forms existing immediately before the Petition Date will not prejudice parties in interest.  Parties doing business with the Debtors undoubtedly will know of their status as debtors in possession and, thus, changing forms such as letterhead would be an unnecessary additional expense.

37.     In other large chapter 11 cases, courts in this district have allowed debtors to use business forms printed prepetition without the "debtor in possession" label.  *See, e.g.*, *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Sept. 12, 2016); *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. July 29, 2016); *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. June 30, 2016); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. June 28, 2016); *In re Midstates Petroleum Co., Inc.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016); *In re Southcross Holdings LP*, No 16-20111 (MI) (Bankr. S.D. Tex. Mar. 29, 2016).

## VII.     Cause Exists to Waive Section 345 of the Bankruptcy Code.

38.     The Debtors further seek a waiver of the deposit and investment requirements of section 345 of the Bankruptcy Code to the extent the Cash Management System does not strictly comply section 345 of the Bankruptcy Code and they cannot otherwise reach agreement with the U.S. Trustee regarding alternative solutions.

17

39.     Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345 requires debtors to obtain, from the entity with which the money is deposited, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, or "the deposit of securities of the kind specified in section 9303 of title 31," unless the Court "for cause" orders otherwise.  11 U.S.C. § 345(a)–(b).

40.     As discussed above, each depository Bank Account is maintained at a bank that is insured by the FDIC and, therefore the Bank Accounts are in compliance with section 345(b) of the Bankruptcy Code.  With respect to amounts in any of the Bank Accounts in excess of the FDIC insurance limit, the Debtors submit that cause exists to waive any such noncompliance because such funds are deposited safely and prudently at Cadence Bank, which is a financially-stable banking institution and authorized depository in the Southern District of Texas, in a manner specifically designed to preserve capital, maintain liquidity, and generate return.  To the extent the amounts in any of the Bank Accounts maintained at Deutsche Bank exceed the FDIC insurance limit during these chapter 11 cases, the Debtors request that the Court give the Debtors 60 days to bring such accounts into compliance with section 345(b) or otherwise arrive at some other arrangement with the U.S. Trustee.

## VIII.   The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Administrative Priority Status to Postpetition Intercompany Claims Among the Debtors.

41.     The Debtors' funds move through the Cash Management System as described above.  At any given time, there may be Intercompany Claims owing by one Debtor to another.

18

Intercompany Transactions are made between and among Debtor affiliates in the ordinary course as part of the Cash Management System.[8]   The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions previously described.   The Debtors, moreover, will continue to maintain records of such Intercompany Transactions.   If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' and their estates' detriment.   Accordingly, the Debtors respectfully submit that the continued performance of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such performance.

42.   Because these transactions represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System, the Debtors respectfully request the authority to continue conducting the Intercompany Transactions in the ordinary course of business without need for further Court order and request that pursuant to section 503(b)(1) and 364(b) of the Bankruptcy Code, all postpetition payments between or among a Debtor and another Debtor on account of an Intercompany Transaction be accorded administrative expense status.   This relief will ensure that each entity receiving payments from a Debtor will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to each Debtor's respective creditors.

---

[8]   Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises like that of the Debtors, the Debtors submit the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require this Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their business as debtors in possession.  For the avoidance of doubt, the Debtors do not intend to, and will not during these chapter 11 cases, transfer funds to any non-Debtor affiliates without further order from the Court and notice to the U.S. Trustee, the DIP Agent (as defined in the DIP Motion), the DIP Lenders (as defined in the DIP Motion), and any official committee appointed in these chapter 11 cases.

43.     Similar relief has been granted in other comparable multi-debtor chapter 11 cases in this district and others.  *See, e.g.*, *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Sept. 12, 2016); *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. June  30, 2016); *In re Ultra Petrol. Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. June 28, 2016); *In re Southcross Holdings LP*, No 16-20111 (MI) (Bankr. S.D. Tex. Mar. 29, 2016).

## Emergency Consideration

44.     In accordance with Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

45.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Reservation of Rights**

46.     Nothing contained herein is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an admission as to the validity, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (f) a waiver of any claims or causes of action which may exist against any entity.

**Notice**

47.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) Deutsche Bank Trust Company Americas, as administrative agent under the Debtors' prepetition first lien credit facility, and counsel thereto; (d) Delaware Trust Company, as administrative agent under the Debtors' prepetition second lien credit facility, and counsel thereto; (e) counsel to the ad hoc group of holders of claims under the Debtors' prepetition first lien credit facility; (f) counsel to the ad hoc group of holders of claims under the Debtors' prepetition second lien credit facility; (g) counsel to the Sponsor; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys general for states in which the Debtors conduct business; (l) the Cash Management Banks; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice is required.

## <u>No Prior Request</u>

48.     No prior request for the relief sought in this Motion has been made to this or any other court.


*[Remainder of page intentionally left blank.]*

22

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| Houston, Texas | /s/ Patricia B. Tomasco |
| Dated:  April 30, 2017 | Patricia B. Tomasco (TX Bar No. 01797600) |

Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:        ptomasco@jw.com
              mcavenaugh@jw.com
              jwertz@jw.com

-and-

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        edward.sassower@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
William A. Guerrieri (*pro hac vice* admission pending)
Bradley Thomas Giordano (*pro hac vice* admission pending)
Christopher M. Hayes (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        james.sprayregen@kirkland.com
              will.guerrieri@kirkland.com
              bradley.giordano@kirkland.com
              christopher.hayes@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

       I certify that on April 30, 2017, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                       */s/ Patricia B. Tomasco*

                                       Patricia B. Tomasco