## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| AMERIFORGE GROUP INC., *et al.*,[1] | § | Case No. 17-32660 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Pending) |
| | § | (Emergency Hearing Requested) |

## DEBTORS' EMERGENCY MOTION
## FOR ENTRY OF AN ORDER (I) AUTHORIZING
## THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER
## COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE
## EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF

**THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER ON <u>MAY 2, 2017, AT 2:30 P.M. (CT)</u> BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Ameriforge Group Inc. (7053); 230 Bodwell Corporation (3965); Advanced Joining Technologies, Inc. (6451); AF Gloenco Inc. (9958); AFG Brazil Holdings LLC (8618); AFG Brazil LLC (8720); AFG Louisiana Holdings Inc (4743); Allpoints Oilfield Services LLC (8333); Ameriforge Corporation (1649); Ameriforge Cuming Insulation LLC (0264); Century Corrosion Technologies LLC (8548); Cuming Corporation (9782); Dynafab Acquisitions Corp. (1331); Flotation Technologies LLC (4572); FR AFG Holdings, Inc. (2623); NRG Manufacturing Louisiana LLC (5823); NRG Manufacturing Inc (7544); Steel Industries Inc. (5154); Steel Industries Real Estate Holding LLC (1298); and Taper-Lok Corporation (8833). The debtors' service address is: 945 Bunker Hill Road, Suite 500, Houston, Texas 77024.

The above-captioned debtors and debtors in possession (together, the "Debtors") respectfully state the following in support of this motion (this "Motion"):

**Relief Requested**

1.      The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, and (b) granting related relief.

**Jurisdiction, Venue, and Background**

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order"). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

4.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and

2

managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have concurrently filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Curtis S. Samford in Support of Chapter 11 Petitions and First Day Motions* (the "Samford Declaration"), filed contemporaneously herewith and incorporated herein by reference.[2]

### The Debtors' Workforce

5.     The Debtors employ approximately 720 individuals on a full-time basis (collectively, the "Employees"). Approximately 230 Employees receive a salary, and approximately 490 Employees are paid on an hourly basis. Salaried Employees are not eligible for overtime, whereas hourly Employees are eligible for overtime. None of the Employees are represented by a union or collective bargaining unit. The Employees perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' restructuring. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Debtors' Employees include highly trained personnel who are not easily replaced. Without the continued, uninterrupted services of their Employees, the Debtors' restructuring efforts will be halted.

6.     In addition to the Employees, the Debtors supplement their workforce with approximately 3 independent contractors (the "Independent Contractors") and approximately 100 temporary workers (the "Temporary Staff") to fulfill certain duties on a short-term basis. The duties include, but are not limited to (a) general labor, (b) information technology consulting

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Samford Declaration.

services, and (c) corporate services.  The Debtors use three staffing agencies to hire Temporary Staff (the "Temporary Staffing Agencies").  The Independent Contractors and Temporary Staff are a critical supplement to the efforts of the Debtors' Employees.

7.      The vast majority of employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, employees will be exposed to significant financial hardships if the Debtors are not permitted to continue paying their compensation, providing benefits, and maintaining existing programs.  Consequently, the relief requested is necessary and appropriate.

## Compensation and Benefits

8.      The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected.  The Debtors are seeking authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, and other related obligations and health and welfare benefits that the Debtors have historically provided to their Employees, Independent Contractors, Temporary Staff, and Temporary Staffing Agencies (collectively, the "Compensation and Benefits").  The Debtors also seek to pay all costs incidental to the Compensation and Benefits.

9.      Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Compensation and Benefits programs in the ordinary course of business on a postpetition basis and to pay prepetition amounts (if any) related thereto.  To the extent applicable, the Debtors also request authority to modify, change, and discontinue any of their Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

4

I.      **Compensation and Withholding Obligations**.

   A.      **Unpaid Wages**.

   10.      In the ordinary course of their business, the Debtors pay the Employees' wage and salary obligations (collectively, the "Wages") by making direct deposits to the Employees or paying the Employees via CashPay[3] on a semi-monthly or weekly basis.  Salaried Employees are generally paid current on a semi-monthly basis on the 15th and last day of each month, and hourly Employees are generally paid weekly in arrears on every Friday.  The Debtors' average monthly gross payroll expense, including all Wages, is approximately $6,000,000.  As of the Petition Date, the Debtors believe that they owe approximately $15,000 of accrued prepetition wages, salaries, overtime, and other compensation (excluding reimbursable expenses, paid time off, and amounts related to the Debtors' 401(k) plan) (collectively, the "Unpaid Wages").  To the extent any prepetition obligations on account of Unpaid Wages remain outstanding, the Debtors request authority to pay such Unpaid Wages in the ordinary course of business on a postpetition basis.

   B.      **Unpaid Commissions**.

   11.      In addition to the wage and salary obligations, certain of the Employees are entitled to receive commissions in addition to their base salary.  In particular, the Debtors pay commissions to 25 Employees engaged in sales, marketing, and business development (the "Sales Representatives").  The Sales Representatives are responsible for building and maintaining customer relationships, with the goal of increasing sales opportunities.  In return, the Sales Representatives receive commission payments in variable percentages based on set methodologies developed by each such Sales Representative's business unit, which typically tie

---

3      CashPay is a form of payment administered by Bank of America, N.A. and used for the Employees who do not have bank accounts.  Specifically, CashPay consists of debit cards distributed to certain Employees that are funded by the Debtors with each Employee's respective payroll disbursements.

the commission payments to the amount and terms of equipment sold through their efforts (the "Commissions").  In 2016, the Debtors paid Commissions totaling approximately $105,000 in the aggregate.  The Debtors do not believe that any accrued payments on account of the Commissions will exceed the $12,850 priority cap imposed under subsections (a)(4) and (a)(5) of section 507 of the Bankruptcy Code with respect to the Sales Representatives.  As of the Petition Date, $30,000 of Commissions remain outstanding, and the Debtors request authority to pay such amounts in the ordinary course of business on a postpetition basis.

 **C.**  **Independent Contractors and Temporary Staff**.

 12. On an annual basis, the Debtors spend approximately $3.4 million on payments to the Independent Contractors and Temporary Staffing Agencies (collectively, the "Contractor Compensation").  The Debtors estimate that, as of the Petition Date, approximately $1.1 million of obligations to the Independent Contractors and the Temporary Staffing Agencies remains outstanding on account of services rendered prior to the Petition Date.  Pursuant to this Motion, the Debtors request authority to pay any such prepetition amounts outstanding and to continue to pay the Contractor Compensation in the ordinary course of business on a postpetition basis.

 **D.**  **Withholding Obligations**.

 13. The Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and other pre-tax deductions payable pursuant to certain of the health and welfare programs (collectively, the "Deductions") for remittance to various third-party recipients.  As of the Petition Date, the Debtors do not believe that there are any aggregate Deductions.

 14. Applicable law also requires the Debtors to withhold from the Employees' Wages certain amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate

6

federal, state, and local taxing authorities.  The Debtors must then match certain of the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance, as well as Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes," and, together with the Employee Payroll Taxes, the "Payroll Taxes").  The Payroll Taxes generally are processed and forwarded to the Debtors' third-party payroll service provider, ADP LLC ("ADP") with the disbursement of Wages.  ADP in turn remits the funds to the appropriate federal, state, or local taxing authority. As of the Petition Date, the Debtors estimate that no Payroll Taxes are outstanding.  To the extent any such prepetition amounts remain outstanding, the Debtors seek authority to pay the Payroll Taxes.

15.     The Debtors seek authority to transfer any unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") to the appropriate recipients in the ordinary course of business and consistent with past practice and to continue remitting any Withholding Obligations in the ordinary course of business on a postpetition basis.  As of the Petition Date, the Debtors estimate that no Withholding Obligations are outstanding.

### E.    Payroll Processing.

16.     The Debtors utilize ADP to process payroll disbursements and provide certain related services.  The Debtors have historically paid approximately $35,000 per month to ADP on account of such services.  As of the Petition Date, the Debtors owe approximately $3,010 in prepetition fees to ADP.  The failure to pay prepetition or postpetition payroll servicing fees may delay employee payroll disbursements to the detriment of their Employees and the Debtors' operations.  To the extent any such prepetition amounts remain outstanding, the Debtors seek to continue administering payroll in the ordinary course of business on a postpetition basis (including paying any prepetition or postpetition amounts payable to ADP).

7

F.      **Expense Reimbursements**.

17.     The Debtors have historically reimbursed Employees for certain expenses incurred in the scope of their employment related to, among other things, travel, lodging, ground transportation, meals, relocation costs, and other reasonable and documented out-of-pocket business-related expenses (collectively, the "Expense Reimbursements").

18.     Generally, the Employees use Visa corporate credit cards to pay for their reimbursable expenses.  The Employees may, however, incur certain Expense Reimbursements through the use of personal funds, and the Employee may be held personally liable for any unpaid obligations.  Thus, the Debtors' inability to reimburse such expenses to these Employees could impose severe hardship on such individuals where they otherwise incurred obligations for the Debtors' benefit.

19.     On average, the Debtors have historically paid approximately $30,000 per month on account of Expense Reimbursements.[4]  As of the Petition Date, the Debtors estimate that $10,000 in Expense Reimbursements remain outstanding.  To the extent any such prepetition amounts remain outstanding, the Debtors seek authority to honor such outstanding prepetition obligations in the ordinary course of business and consistent with past practice and to continue paying any such obligations related thereto in the ordinary course of business on a postpetition basis.

---

[4]     For the avoidance of doubt, the Expense Reimbursements do not include expense reimbursements that are otherwise covered by the Purchase Cards (as defined in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief*, filed contemporaneously herewith), and the Debtors do not seek to pay such amounts pursuant to this Motion.

II.     **Employee Benefit Programs**.

      A.     **Health Insurance Programs**.

          1.     **The Medical Plans**.

20.     The Debtors are self-insured and offer comprehensive medical coverage to current Employees (the "Medical Plan"), administered by Blue Cross Blue Shield of Texas ("BCBS"). Under the Medical Plan, participants receive coverage for, among other things, preventive care, doctor visits, hospital care, prescription drugs, vision care, and wellness. Monthly health care premiums paid under the Medical Plan vary depending on whether the participant has dependents covered by the applicable plan. Participants pay semi-monthly or weekly premiums, consistent with their payroll cycle, which are deducted from their paychecks.

21.     The Debtors incur claims of approximately $800,000 per month (paid in arrears) to cover the costs of medical benefits received by Employees. The Debtors pay approximately $75,000 per month to BCBS to administer the Medical Plan. As of the Petition Date, the Debtors owe approximately $75,000 on account of accrued, unpaid administrative fees outstanding, and estimate that they owe approximately $800,000 to cover Employees' prepetition claims for healthcare costs. To the extent any such prepetition amounts remain outstanding, the Debtors seek authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Medical Plan and to continue administering the Medical Plan in the ordinary course of business and consistent with past practice.

22.     In addition, the Debtors provide their Employees with access to flexible spending accounts (the "FSAs") administered by Benefit Plan Administrators, Inc. ("BPAS") to cover incidental medical costs and dependent child care. The Debtors do not make any contributions to any Employee's FSAs. As of the Petition Date, approximately 70 Employees use FSAs for medical costs, and 10 Employees use FSAs for dependent child care, for which the Debtors pay a

9

monthly administration fee of approximately $900.  From time to time, the Debtors may hold Employee contributions under the FSAs through BPAS (the "Unremitted FSA Obligations"). BPAS then directly debits a Debtor account for claims submitted and approved by Employees for the week prior.  The Debtors believe the Unremitted FSA Obligations are held in trust for the participating Employees and are not property of their estates.  Therefore, the Debtors do not believe they need authority to distribute the Unremitted FSA Obligations to BPAS.  However, out of an abundance of caution, the Debtors seek authority to forward the Unremitted FSA Obligations to BPAS that become due prior to the Final Hearing and to continue paying any administrator fees in connection with the FSA and honoring the obligations of the FSA on a postpetition basis in the ordinary course of business and consistent with their prepetition practices.

23.    Pursuant to the requirements of the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), the Debtors provide temporary continuation of healthcare benefits at group rates to former Employees after their termination, retirement, or disability leave.  The former Employees bear all costs associated with COBRA.  While the Debtors do not expect any costs to arise associated with the benefit, the Debtors request that former Employees and eligible dependents retain the right to coverage under the Debtors' Medical Plan in accordance with the requirements of the terms of COBRA and request authorization to pay obligations (if any) arising under such plans, regardless of when such obligations accrued.

**B.    Insurance, Disability, and Workers' Compensation Programs**.

**1.    Life and AD&D Insurance Programs**.

24.    The Debtors provide life and accidental death and dismemberment insurance coverage to current and certain former Employees (the "Standard Life and AD&D Insurance") through Unum Life Insurance Company of America ("Unum"), which provides maximum

10

coverage per Employee of two times the annual salary of the Employee for term life insurance up to a maximum of $250,000 with a minimum of $50,000 and an additional two times the annual salary of the Employee for accidental life and dismemberment insurance coverage.  Current and certain former Employees may also purchase through Unum voluntary life insurance, which provides maximum coverage of an additional $500,000 in the event of death (the "Voluntary Life Insurance"), and voluntary accidental death and dismemberment insurance, which provides maximum coverage of an additional $500,000 (the "Voluntary AD&D Insurance" and together with the Standard Life and AD&D Insurance and Voluntary Life Insurance, the "Life and AD&D Insurance").  Employees are eligible for the Life and AD&D Insurance as of the first of the month following 30 days of employment.  The Debtors are fully insured through the Standard Life and AD&D Insurance, and the Debtors pay approximately $17,000 per month with respect to their portion of the premiums for the Life and AD&D Insurance.

25.     As of the Petition Date, the Debtors estimate no prepetition Life and AD&D Insurance obligations remain outstanding.  To the extent any prepetition amounts remain outstanding, the Debtors seek authority to pay the Life and AD&D Insurance obligations.

### 2.     Disability Benefits.

26.     The Debtors provide Employees with short-term disability benefits (the "Short-Term Disability Benefits") and long-term disability benefits (the "Long-Term Disability Benefits" and together with the Short-Term Disability Benefits, the "Disability Benefits") administered by Unum.  The Short-Term Disability Benefits, available to Employees on the 8th consecutive day of disability due to an accidental injury or sickness, continue for up to 12 weeks of any disability thereafter and permit eligible Employees to continue to receive the lesser of 60 percent of their weekly salary or $1,385 reduced by other income benefits.  The Long-Term Disability Benefits, available to Employees on the 91st

consecutive day of absence from work, generally permit eligible Employees to continue to receive 60 percent percent of their monthly wages (subject to a monthly maximum of $6,000)[5] in the event of qualified long-term medical disability due to illness or injury.  The Debtors pay Unum approximately $25,000 per month in premiums with respect to the Disability Benefits.  As of the Petition Date, two Employees currently receive Short-Term Disability Benefits.

27.     As of the Petition Date, the Debtors believe they owe approximately $55,000 on account of the Disability Benefits and associated premiums.  To the extent any prepetition amounts remain outstanding, the Debtors seek authority to pay the Disability Benefits.

### 3.     Workers' Compensation Program.

28.     The Debtors maintain workers' compensation insurance for Employees at the levels required by laws in the states in which the Debtors operate (or previously operated) (collectively, the "Workers' Compensation Program").   More specifically, Zurich American Insurance Company maintains the Workers' Compensation Program for Employees.   The Workers' Compensation Program is covered under a premium financing agreement with Aon Finance.[6]  The deductible for the Workers' Compensation Program is $250,000 per incident. Historically, the Debtors have paid approximately $25,000 per year on account of deductibles. As of the Petition Date, the Debtors estimate that no Workers' Compensation fees remain outstanding.   To the extent any prepetition amounts remain outstanding, the Debtors seek authority to pay the Workers' Compensation fees in the ordinary course.

---

[5]     The monthly maximum for executive Employees is $15,000 per month.

[6]     *See Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies in the Ordinary Course of Business, (C) Honor Their Prepetition Insurance Premium Financing Agreement, (D) Renew Their Premium Financing Agreement in the Ordinary Course of Business, and (E) Continue Their Surety Bond Program and (II) Granting Related Relief*, filed contemporaneously herewith.

KE 45570821

29.     Currently, 14 individuals, including current and former Employees, are collecting workers' compensation from the Debtors.  Additionally, it is possible that certain obligations under the Workers' Compensation Program may have been incurred prepetition but have yet to be asserted against the Debtors.  For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with applicable state law, the Debtors must continue to assess, determine, and adjudicate claims (if any).  Accordingly, the Debtors seek authority, but not direction, to continue to maintain the Workers' Compensation Program in the ordinary course of business, including by modifying the automatic stay solely to facilitate the administration of the Workers' Compensation Program.

### C.     The 401(k) Plan.

30.     The Debtors provide all Employees over the age of 18 with the opportunity to participate in a 401(k) employee retirement plan (the "401(k) Plan") administered by Fidelity Investments.  Employees are generally eligible to participate in the 401(k) Plan as of the first day of the month following the date of their hire.  The 401(k) Plan generally provides for pre-tax deductions of compensation up to limits set by the Internal Revenue Code, as well as for certain post-tax deductions.  Each Employee's 401(k) contributions are deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions").

31.     The Debtors may match 35 percent of each eligible Employee's 401(k) Plan contributions up to 6 percent of such Employee's compensation (the "401(k) Contributions").[7] The 401(k) Contributions are fully vested after three years of service with the Debtors.  The 401(k) Contributions, which have historically totaled approximately $2.75 million per year, are

---

[7]     Debtor AF Gloenco Inc. may match up to 50 percent of each Eligible Employees' 401(k) Plan Contributions up to 8 percent of such Employee's compensation.

13

transferred to the 401(k) Plan each pay period.  As of the Petition Date, the Debtors are holding approximately $150,000 in unremitted 401(k) Contributions and 401(k) Deductions.  The Employees pay Fidelity Investments, which acts as investment advisor to the 401(k) Plan, annual administrative fees based on the funds they choose to invest in.

### D.      Education Assistance Program.

32.      The Debtors reimburse certain tuition costs incurred by Employees (the "Education Assistance Program").  Pursuant to the Education Assistance Program, the Debtors reimburse Employees who maintain at least a C+ average in their courses up to 90 percent of the tuition required for enrollment up to $5,250 per calendar year for undergraduate courses and $8,000 for graduate courses.  As of the Petition Date, three Employees participate in the Education Assistance Program.  The Debtors believe that, as of the Petition Date, there are no accrued prepetition Education Assistance Program payments.  The Debtors request the authority to continue honoring obligations associated with the Education Assistance Program in the ordinary course.

### E.      Safety Equipment Program.

33.      The Debtors maintain a safety equipment program for approximately 400 Employees who work near drilling sites, warehouses, or other potentially dangerous locations (the "Safety Equipment Program").  Pursuant to the Safety Equipment Program, the Debtors purchase and provide Employees with safety equipment necessary for their jobs, including safety goggles and shoes, as well as organize training sessions to educate Employees on mandatory safety requirements.  The Debtors have historically spent approximately $150,000 each year on the Safety Equipment Program.  As of the Petition Date, the Debtors estimate that there are no unpaid obligations related to the Safety Equipment Program.  To the extent any prepetition

14

amounts remain outstanding, the Debtors seek authority to pay the obligations associated with the Safety Equipment Program.

**F.      Paid Leave**.

34.     The Debtors maintain the following paid leave benefit programs (collectively, the "Paid Leave") for Employees:

- Paid Time Off.  In the ordinary course of business, the Debtors provide paid time off ("PTO") to each eligible Employee in the form of vacation days.  Vacation time is accrued at a specified rate based on the Employee's years of service and date of hire.  Employees generally may not carry over any vacation time into future calendar years, absent exceptional circumstances.  The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued but unpaid vacation time is approximately $2.4 million.  This amount, however, is not a current cash payment obligation, as Employees are only entitled to cash payment for accrued and unused vacation time in the event the Employees leave the Debtors' employment.  For the avoidance of doubt, the Debtors seek to pay prepetition PTO on account of unused vacation time upon an Employee's departure solely to the extent such PTO for a particular Employee does not exceed the priority wage cap under section 507(a)(4) of the Bankruptcy Code, unless applicable state law requires such payment.  The Debtors otherwise will request authority to make such payments in excess of the priority wage cap by separate motion.

- Holidays.  The Debtors also offer Employees 10 paid holidays throughout the year (each a "Holiday" and collectively, the "Holidays").  Generally, eligible Employees are not required to work on a designated Holiday and are paid for Holiday time at their base rate of pay.

35.     The Debtors believe that the continuation of the Paid Leave policy in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policy is a broad-based program upon which all Employees have come to depend. Finally, the Debtors anticipate that their Employees will use any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

KE 45570821

G.    **Additional Benefits**.

36.    The Debtors provide their Employees with certain additional benefits, including company-provided telephones (the "Company Phones"), which, given the frequency with which certain Employees travel in the ordinary course of their job function, are esstential to Debtors' operations.  The Debtors currently provide 360 Employees with Company Phones, which are used in the ordinary course operation of the Debtors' businesses.  The Debtors pay approximately $37,500 per month on account of the Company Phones.  The Debtors estimate approximately $55,000 remains outstanding on account of the Company Phones as of the Petition Date.

H.    **Non-Insider Severance Program**.

37.    In the ordinary course of their businesses, the Debtors historically have provided severance payments to certain Employees who have been involuntarily terminated.  There is no formal severance policy, and severance payments are made on a case-by-case basis to Employees who are terminated with at least three years' of service (the "Non-Insider Severance Program"). In most cases, payments made under the Non-Insider Severance Program are provided to former Employees in exchange for releases entered into with such Employees, whereby the Employees release claims otherwise held against the Debtors and agree to, among other things, not disclose confidential information, solicit employees, or disparage the Debtors for a certain period of time. Further the Debtors are not seeking to make any payments to Insiders pursuant to the relief requested in this Motion.  To the extent the Debtors seek to make severance payments to insiders, the Debtors shall request specific authority in a separate motion.

38.    If the Debtors are unable to continue the Non-Insider Severance Program and pay unpaid severance to non-insider Employees, current Employees may question the Debtors' commitment to the Non-Insider Severance Program (and Employees generally), which is

intended to ease their financial burden in the event they are terminated. Employee morale and loyalty will be jeopardized at a time when Employee support is most critical. Moreover, the Debtors will lose the benefit of the releases signed by former Employees and the protections afforded the Debtors therein. The Debtors must fulfill their obligations under the Non-Insider Severance Program to reassure all Employees that the Debtors will continue to honor their obligations to Employees—both during and after their tenure with the Debtors—including those incurred postpetition under the Non-Insider Severance Program, as well as to ensure that the Debtors' continue to enjoy the protections offered by the severance releases.

39.     As of the Petition Date, no former Employees are entitled to severance payments under the Non-Insider Severance Program for services rendered before the Petition Date. The Debtors believe that there are no payments that have accrued and remain outstanding on account of the Non-Insider Severance Program (the "Unpaid Severance"). The Debtors request authority to continue the Non-Insider Severance Program in the ordinary course and pay any Unpaid Severance to the extent any prepetition obligations on account of Unpaid Severance exist.

## Basis for Relief

**I.      Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits**.

**A.      Certain Compensation and Benefits Are Entitled to Priority Treatment**.

40.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Compensation and Benefits owed to the Employees to priority treatment. Under section 1129(a)(9)(b) of the Bankruptcy Code, the Debtors must pay these priority claims in full to confirm a chapter 11 plan. Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees and should not negatively affect recoveries for

general unsecured creditors.  Indeed, the Debtors submit that payment of the Compensation and Benefits at this time enhances value for the benefit of all interested parties.

> **B.**     **Payment of Certain Compensation and Benefits Is Required by Law**.

41.     The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks.  Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf.  *See* 11 U.S.C. § 541(b)(1), (d).  Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority.  26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

42.     Similarly, state laws require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  Payment of all workers' compensation amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

KE 45570821

**II.      Payment of the Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity**.

43.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

44.     Furthermore, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity."  The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity"); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's

continued operation); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

45.     The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the chapter 11 process").

46.     Paying the Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases.  The majority of the Employees, Independent Contractors, Temporary Staff, and Temporary Staffing Agencies rely exclusively on the Compensation and Benefits to satisfy their daily living expenses.  Consequently, Employees will be exposed to

significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

47.     Moreover, the Employees, Independent Contractors, Temporary Staff, and Temporary Staffing Agencies provide the Debtors with services necessary to conduct the Debtors' businesses, and the Debtors believe that absent the payment of the Compensation and Benefits owed, the Debtors may experience turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees, Independent Contractors, and Temporary Staff may become demoralized and unproductive because of the potential significant financial strain and other hardships these individuals may face. Such individuals may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—efforts that may not be successful given the overhang of these chapter 11 cases. The Debtors therefore believe that payment of the prepetition obligations with respect to the Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

48.     Indeed, bankruptcy courts in the Fifth Circuit have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested herein. *See, e.g.*, *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. July 21, 2016); *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. July 1, 2016); *In re Ultra Petrol. Corp.*, No 16-32202 (MI) (Bankr. S.D. Tex. June 14, 2016); *In re Linn Energy LLC*,

21

No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016); *In re Goodrich Petrol. Corp.*, No. 16-31975 (MI) (Bankr. S.D. Tex. May 4, 2016); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016).[8]   Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Compensation and Benefits in the ordinary course of business and consistent with past practice.

### III.   A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

49.     Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . ."  11 U.S.C. § 362(a)(1).

50.     Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1).  Cause exists here to modify the automatic stay to permit the Employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum. Staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture.  Such departures could cause a severe disruption in the Debtors' business to the detriment of all stakeholders.  Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed in the ordinary course.

---

[8]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

51.     The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and postpetition financing.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Compensation and Benefits, as applicable.  Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests the Court has not authorized will be made inadvertently.  Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**Emergency Consideration**

52.     In accordance with Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

53.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **Reservation of Rights**

54.     Nothing contained herein is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an admission as to the validity, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (f) a waiver of any claims or causes of action which may exist against any entity.

## **Notice**

55.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) Deutsche Bank Trust Company Americas, as administrative agent under the Debtors' prepetition first lien credit facility, and counsel thereto; (d) Delaware Trust Company, as administrative agent under the Debtors' prepetition second lien credit facility, and counsel thereto; (e) counsel to the ad hoc group of holders of claims under the Debtors' prepetition first lien credit facility; (f) counsel to the ad hoc group of holders of claims under the Debtors' prepetition second lien credit facility; (g) counsel to the Sponsor; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys

24

general for states in which the Debtors conduct business; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice is required.

### No Prior Request

56. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| Houston, Texas | /s/ Patricia B. Tomasco |
| Dated:  April 30, 2017 | |

Patricia B. Tomasco (TX Bar No. 01797600)
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:  (713) 752-4200
Facsimile:  (713) 752-4221
Email:       ptomasco@jw.com
               mcavenaugh@jw.com
               jwertz@jw.com

-and-

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:       edward.sassower@kirkland.com

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
William A. Guerrieri (*pro hac vice* admission pending)
Bradley Thomas Giordano (*pro hac vice* admission pending)
Christopher M. Hayes (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:       james.sprayregen@kirkland.com
               will.guerrieri@kirkland.com
               bradley.giordano@kirkland.com
               christopher.hayes@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## **Certificate of Service**

I certify that on April 30, 2017, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Patricia B. Tomasco*
Patricia B. Tomasco